Christopher Lee ORSAG, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–08–00524–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

March 25, 2010.

Rehearing Overruled June 10, 2010.

W. Troy McKinney, Houston, for appellant.

Jason Travis Bennyhoff, Richmond, for appellee.

Panel consists of Justices YATES, SEYMORE, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

Appellant Christopher Lee Orsag was found guilty by a jury of felony driving while intoxicated. The trial court assessed punishment of four years in the Texas Department of Criminal Justice, Institutional Division, probated for four years, and a $1,000 fine. On appeal, Orsag raises four issues: (1) the trial court erred in overruling his motion to suppress; (2) the evidence was legally insufficient to prove he had previously been convicted two or more times of the offense of driving while intoxicated; (3) the trial court erred in overruling his objection to the State's alleged misstatement of the law in its opening statement; and (4) the trial court erred in overruling his objection to the admissibility of certain documents. We affirm.

I

On the evening of March 9, 2009, Officer Danny Cornelius, Jr., of the Sugar Land Police Department was sitting in his patrol car observing northbound traffic on U.S. Highway 59. Across the divided highway, Cornelius saw a blue Toyota pickup speeding. Using his laser device, he clocked the pickup at 90 miles per hour in a 65–miles–per–hour zone. Because Cornelius was unable to cross the divided freeway, he broadcast a description of the pickup to other officers.

Sergeant Wayne Coleman of the Sugar Land Police Department was on patrol and traveling southbound on the highway and saw Orsag's blue Toyota pickup. Based on the dispatch call, Coleman turned on his lights to signal Orsag to stop. By the time Coleman approached Orsag's vehicle, traffic had slowed due to construction requiring drivers to merge into fewer lanes. Orsag was not speeding when Coleman stopped him. At first, Orsag moved to the left side of the road next to a concrete barrier, and Coleman had to direct Orsag to pull over to the right side of the road where there was a shoulder. Coleman did not confirm with Cornelius that the vehicle he stopped was the same vehicle Cornelius saw speeding.

When Coleman approached Orsag and asked him for his identification, he noticed

that Orsag's eyes were bloodshot and red and his eyelids were very droopy. Coleman also noticed a faint odor of alcohol and a very strong odor of tobacco on Orsag's breath. Orsag denied drinking, but his passenger, his fiancé Holli Woodling, confirmed that he had two beers that night while they were at the rodeo. After Orsag again denied drinking, Coleman performed field-sobriety tests on him. Based on Orsag's performance, Coleman arrested Orsag for DWI and took him to jail. At jail, Orsag refused to take a breath test, and evidenced his refusal by signing a "DIC–24" form.

## II

In his first issue, Orsag contends the trial court erred in overruling his motion to suppress on the grounds that he was illegally seized without reasonable suspicion in violation of the Fourth Amendment of the United States Constitution. Specifically, Orsag contends Coleman stopped him without reasonable suspicion or probable cause because the stop was based solely on another officer's police-radio broadcast that he had observed a blue Toyota pickup speeding, and Coleman did not observe Orsag speeding or committing any other offense. Based on the totality of the circumstances, Orsag contends, a reasonable officer could not have pointed to specific and articulable facts to warrant a suspicion that Orsag's vehicle—as opposed to another vehicle—was the same vehicle reported on the police broadcast.

### A

We review the trial court's ruling on a motion to suppress under an abuse-of-discretion standard. *Shepherd v. State,* 273 S.W.3d 681, 684 (Tex.Crim.App.2008). We view the evidence adduced in the light most favorable to the trial court's ruling. *Id.* We give almost total deference to a trial court's express or implied determination of historical facts and review de novo the court's application of the law of search and seizure to those facts. *Id.*

Law-enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than that required for probable cause to arrest. *See Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Chapnick v. State,* 25 S.W.3d 875, 877 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). An officer must have reasonable suspicion to justify an investigatory stop. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Reasonable suspicion for an investigatory detention arises when an officer has specific articulable facts which, premised on his experience and personal knowledge and coupled with the logical inferences from those facts, warrant intruding on the detained citizen's freedom. *Chapnick,* 25 S.W.3d at 877. The validity of the stop is determined from the totality of the circumstances. *Id.* (citing *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581).

### B

#### 1

As an initial matter, Orsag contends that we may consider only the evidence adduced before the trial court ruled on the suppression motion. On these facts, we disagree.

Generally, the appellate court reviews the trial court's ruling in light of what was before it at the time the ruling was made. *See Rangel v. State,* 250 S.W.3d 96, 97–98 (Tex.Crim.App.2008); *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim.App.2000). This general rule does not apply, however, when the alleged error is the admission of evidence at trial and the issue was consensually litigated at

trial. *See Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996); *see also Gutierrez v. State,* 221 S.W.3d 680, 687 (Tex. Crim.App.2007) ("[W]hen the parties subsequently re-litigate the suppression issue at the trial on the merits, we consider all evidence, from both the pre-trial hearing and the trial, in our review of the trial court's determination.").

Here, unlike most cases, the motion to suppress was not litigated in a pretrial hearing. Instead, Orsag's counsel interjected the motion during the State's examination of its second witness. The State's first witness was Officer Cornelius. Cornelius testified that he was working on a selective traffic-enforcement assignment primarily designed to identify intoxicated drivers when he observed a blue Toyota pickup speeding. He was unable to pursue the vehicle because it was in the southbound lanes of Highway 59 and he was facing the northbound lanes, so he radioed a description of the vehicle and that it was speeding to other officers. He had no further involvement in the case.

The State's second witness, Sgt. Coleman, testified that he was on patrol in his marked police cruiser on Highway 59 when he received Cornelius's dispatch call concerning a blue Toyota pickup truck traveling southbound at 90 miles per hour. Coleman also was working on the selective traffic-enforcement assignment. He testified that, at the time of the call, Cornelius broadcast that he was in the 15,000 block of the highway, and Coleman was located "fairly close" in the 14,500 block of the highway on the opposite side. Coleman testified that, as soon as he heard Cornelius's broadcast, he "knew [he] was close" and so he "got on the accelerator" to see if he could catch the speeding vehicle. Near the University Boulevard exit, the traffic slowed as the roadway narrowed down to one lane due to construction. Coleman

testified it was at this point that he saw Orsag's vehicle and stopped him. As the State began to question Coleman concerning his contact with Orsag, defense counsel moved to suppress "all evidence obtained from the point of the stop forward" because the State failed to establish any probable cause or reasonable suspicion to stop Orsag. After a bench conference, the trial court overruled the motion to suppress. No findings of fact or conclusions of law were made.

Immediately after the trial court denied Orsag's motion to suppress, the State asked Coleman whether he saw any other blue Toyota pickups at the time he stopped Orsag, and Coleman answered, "No." Coleman then testified that he stopped Orsag at 11:15 p.m., "right after" Officer Cornelius had spotted him. Orsag did not object to this line of questioning. Indeed, Orsag cross-examined Coleman concerning the reasonableness of the stop, and he raised the issue repeatedly throughout the trial. Orsag also moved for a directed verdict on the ground that the State had failed to prove there was reasonable suspicion to stop him, he began his closing argument to the jury with the issue, and the jury was instructed on reasonable suspicion. Accordingly, on these facts, we will consider the evidence adduced at trial both before and after the court ruled on Orsag's motion to suppress.

2

In addition to the above testimony, Sgt. Coleman testified on cross-examination that his decision to stop Orsag was based on Officer Cornelius's observations of a "blue Toyota pickup," and that he did not see Orsag do anything illegal. Coleman admitted Cornelius did not confirm that Orsag's vehicle was the same one he saw speeding. Coleman acknowledged that Cornelius gave no further details such

as a description of the driver, the model of the truck, whether the truck was large or small, whether it was a two-door or a four-door truck, or whether it had any distinguishing features. Coleman acknowledged that a better description "would have helped." He also admitted that he did not know if the speeding vehicle continued southbound or exited the highway. But Coleman also testified that he knew he had the right vehicle because "it was the only blue Toyota pickup in the inside lane that he said was going that fast" and he did not see any other blue Toyota pickups at the time. On redirect, Coleman testified that he was looking for a blue Toyota speeding in the southbound inside (left) lane, and that it was was "just seconds" before he was at the same location where Coleman made the dispatch call.

Holli Woodling, Orsag's fiancée, testified that Orsag drove a blue Toyota Tacoma and that he was driving south from Houston on Highway 59 towards Richmond–Rosenberg when Coleman stopped them. She also testified that they had been driving in the left lane. Orsag's counsel asked Woodling about the exits on Highway 59 and the distances between them. Woodling testified that the Williams Trace and University Boulevard exits were "pretty close" to one another. Woodling further testified that there were two exits between Williams Trace and University Boulevard, namely Sweetwater and Highway 6, and she "guess[ed]" the distance between Williams Trace and University Boulevard was "about two, two and a half miles, maybe three." Woodling also estimated that the time it would take to drive this distance was "about ten minutes" due to the traffic. She testified that, although she was not sure if the Highway 6 and Sweetwater exits were open that night, she believed it would be possible for a vehicle to have exited those exits. On redirect, Woodling conceded she could not remem-ber for certain if those exits were open or closed that night.

## C

Recognizing that the concept of reasonable suspicion cannot be reduced to "a neat set of legal rules," *Klare v. State,* 76 S.W.3d 68, 73 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd), Orsag nonetheless proposes we consider the following six factors: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation. 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4[g] (3d ed. 1996). Orsag also suggests we consider another factor not identified by Professor LaFave—the urgency of the situation. Applying these factors, Orsag argues that Sgt. Coleman lacked reasonable suspicion to stop Orsag.

Specifically, Orsag contends that it was not reasonable for Sgt. Coleman to stop him because the description of a "blue Toyota pickup," without additional information such as a license-plate number, description of the occupants, or other distinguishing information, is too general a description, "considering the number of pickup trucks traveling the freeways of Houston, Texas on any given Friday night" in heavy traffic. Orsag points out that Sgt. Coleman acknowledged that a better description would have helped his investigation, and Officer Cornelius never confirmed Orsag's vehicle was the same

one he saw. Thus, Orsag argues, Coleman's stop of Orsag's vehicle could only be based on a hunch that it was the same vehicle Cornelius saw speeding. Orsag also argues that the evidence of the time and distance between the dispatch and the stop—particularly Woodling's testimony that due to traffic it would have taken about ten minutes to travel the two- to three-mile distance from the Williams Trace exit to the University exit—makes it possible the suspect could have taken one of the exits in the vicinity. Although Orsag acknowledges that neither Coleman nor Cornelius testified concerning the amount of traffic on Highway 59 that night, he contends it can be inferred that traffic was heavy because it was Friday night on a major freeway and the officers were working overtime patrolling both sides of the freeway looking for intoxicated drivers. Consequently, the "sheer number" of vehicles on the road, coupled with Cornelius's general description and the time and distance between the dispatch and the stop would not warrant an officer to reasonably suspect that Orsag's vehicle was the same one Cornelius saw speeding. Orsag also argues it is unreasonable for Coleman to stop the first blue Toyota pickup he saw, when the probable direction the suspect continued to travel was unknown and the suspect had several opportunities to exit the highway. Orsag also contends that Coleman did not observe him doing anything suspicious, there was no evidence Coleman knew of Orsag or his vehicle before the stop, and there was no urgency to stop him because there was no reason to suspect that he presented any danger to himself or others, as Coleman had no reason to suspect he was intoxicated before he stopped him.

We do not disagree that some or all of the factors Orsag identifies may be relevant to the application of the law to any given set of facts, but we must consider the totality of circumstances in the particular case being reviewed to determine whether a police officer had reasonable suspicion to stop the defendant. See United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); Sokolow, 490 U.S. at 8, 109 S.Ct. 1581. Here, the stop was based on a report from a fellow officer, who was known to the arresting officer, and who informed the arresting officer that a vehicle was committing the traffic offense of speeding.[1] The actual basis for stopping a vehicle need not arise from the officer's personal observation, but may be supplied by information acquired from another person. Brother v. State, 166 S.W.3d 255, 257 (Tex.Crim.App. 2005).

Officer Cornelius, who saw the speeding vehicle, informed Sgt. Coleman of the street on which the suspect vehicle was traveling, the block of the street in which it was traveling, the direction it was traveling, the lane in which it was traveling, the make of the vehicle (Toyota pickup), and the color of the vehicle (blue). Coleman testified he saw a vehicle matching this description within minutes of the dispatch call, a short distance from where it was seen speeding, nearing a construction zone where the vehicle could not easily evade him. He also saw no other blue Toyota

---

1. Orsag argues that a traffic stop based solely on a radio dispatch from another officer is insufficient to establish probable cause. See Glass v. State, 681 S.W.2d 599, 601 (Tex. Crim.App.1984); State v. Jennings, 958 S.W.2d 930, 933 (Tex.App.-Amarillo 1997, no pet.). These cases are distinguishable, however, because the dispatch upon which the arresting officer relied was based on an anonymous report or was relayed by an unknown officer from an unknown source. See Glass, 681 S.W.2d at 601–02; Jennings, 958 S.W.2d at 933.

pickups in the area. On the totality of these circumstances, we conclude that Sgt. Coleman had a reasonable basis to conduct a traffic stop on Orsag's vehicle. *See Mount v. State*, 217 S.W.3d 716, 728–29 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (concluding reasonable suspicion existed to stop "light colored" Cadillac pickup seen within minutes after officer received call about a stolen white Cadillac pickup); *Louis v. State*, 825 S.W.2d 752, 756 (Tex.App.-Houston [14th Dist.] 1992, pet. ref'd) (concluding reasonable suspicion existed to stop three black males in light tan colored Cadillac based on report of two black males driving away from a robbery in a white Oldsmobile).

Orsag attempts to distinguish *Mount* and *Louis*, arguing that in both cases the proximity between the reported location of the suspect's vehicle and the location where the officer saw a similarly described vehicle was exceptionally close. In *Mount*, the officer pulled over a " 'tan or goldish colored or silver, light colored Cadillac pickup truck' " a few minutes after hearing a report of a possible theft of a white pickup truck about a half a block from the location where the officer saw the vehicle. 217 S.W.3d at 720. The court held that the officer was justified in searching for and stopping a vehicle that was similar to the described vehicle. *Id.* at 728–29. In *Louis*, the officers stopped three black men in a light tan colored Cadillac that was the only car on the same street where a store had been robbed and was less than two miles from the robbery scene. 825 S.W.2d at 754. The court held that the officer was justified in stopping the vehicle based on a report of a robbery by two black men who drove away in a white Oldsmobile, because it was reasonable for the officer to infer that the description given might not be completely accurate and the additional male could have been a

getaway driver who did not enter the store. *Id.* at 756.

In contrast to *Mount* and *Louis*, Orsag contends, the size of the area the suspect's vehicle could have traveled between Cornelius's initial observation and Coleman's stop spanned up to three miles of freeway with four possible exits and a possible time frame of ten minutes. But Orsag's argument overstates Woodling's testimony concerning time and distance and fails to account for the totality of the circumstances. Woodling's testimony was tentative, primarily consisting of guesses or estimates concerning the distance between the exits and the time it would take to travel from one to another, and she could not say with certainty whether the exits along the route were open or closed at the time. In contrast, Coleman testified that he and Cornelius were "fairly close" but on opposite sides of the highway, with Colman in the 14,500 block and Cornelius in the 15,000 block, when Cornelius broadcast that he saw a blue Toyota pickup traveling at 90 miles per hour in a 65–mile–per–hour zone. Coleman also testified that he reached Cornelius's location "within seconds" of his broadcast, and he stopped Orsag at 11:15 p.m., "right after" Cornelius reported the speeding vehicle. Coleman also saw no other blue Toyota pickups in the area. Considering the totality of the circumstances, therefore, we disagree that *Mount* and *Louis* compel a reversal of the trial court's ruling. *See Mount*, 217 S.W.3d at 729; *Louis*, 825 S.W.2d at 754–756.

Orsag also contends this case is more analogous to *Glass v. State*, 681 S.W.2d 599 (Tex.Crim.App.1984), and *McMillan v. State*, 609 S.W.2d 784 (Tex.Crim.App. [Panel Op.] 1980). In *Glass*, an unidentified caller reported that occupants of two automobiles described as a brown-over-beige El Camino and a blue Fairlane were shooting at each other at or near the inter-

section of two streets. 681 S.W.2d at 600. Two patrol officers heard the dispatch and went to the intersection, but initially saw no unusual activity occurring. *Id.* After three or four minutes, however, they saw a brown-over-beige El Camino traveling on one of the streets, and they stopped the vehicle. *Id.* The court held that the officers lacked reasonable suspicion to stop the vehicle because the record did not reflect when the alleged incident occurred or when the anonymous report was received, and without any proximity of the stop to the alleged events "it would not be reasonable to conclude, solely on the basis of the match of color and make of the car, that the car stopped was the car involved in the reported incident." *Id.* at 601. In contrast, the broadcast in this case was not based on an alleged incident that occurred at an unknown time and was reported at an unknown time by an anonymous caller. Here, Officer Cornelius, who testified at trial, initially observed the speeding vehicle and immediately broadcast a description of the vehicle's location, description, and direction of travel to other officers. Shortly after the broadcast, Sgt. Coleman stopped a vehicle matching the description given. Thus, the concerns expressed in *Glass* about the absence of any proximity between the alleged incident and the stop are not present in this case.

In *McMillan*, officers on patrol in the early morning hours received a dispatch to investigate a suspicious automobile seen driving slowly with its lights off in a mobile-home park. 609 S.W.2d at 785. The only description of the car was that it was "small and compact." *Id.* On the way to the park, the officers saw a car about four blocks away, but they were unable to determine anything about the car other than distinguishing its taillights when its brakes were on. *Id.* After going to the mobile-home park and failing to find the suspicious automobile, they continued to patrol when they saw a vehicle being driven with its lights off. The officers were unable to identify what color or kind of vehicle it was, but they believed it could have been the same vehicle they had seen earlier based on the taillights. *Id.* at 786. The officers chased the vehicle, but it eluded them. About forty minutes after the initial dispatch, as the officers parked and waited where they had seen the first vehicle, they saw a maroon Camaro approach and stop at the intersection. When the Camaro turned, the officers were able to see its taillights, and believing it to be the same vehicle they had seen earlier, stopped it. *Id.* The court held that the stop was unlawful, in part, because one of the officers testified that "he really had no idea" if the appellant's vehicle was the same one they had chased earlier, and the other officer testified that all he could see of the vehicle was its taillights, which were " 'very similar' " and so it was " 'probably the same vehicle.' " *Id.* The court stated that "[T]he inarticulate hunch, suspicion, or good faith in suspecting the appellants' vehicle to be the one the officers had seen earlier was insufficient to warrant the detention as an investigative stop." *Id.*

*McMillan* is distinguishable because here, Cornelius's description of the speeding vehicle was considerably more detailed than "small and compact," and shortly after Cornelius broadcast the description of a blue Toyota pickup speeding southbound on Highway 59, Coleman stopped Orsag's vehicle, which matched the description given. Although Coleman did admit that it was "possible" he stopped the wrong vehicle, he also testified that the vehicle matched the description Cornelius gave, he saw it shortly after receiving Cornelius's broadcast, and he saw no other blue Toyota pickups in the area. Accordingly, we do not consider either *Glass* or *McMillan* controlling.

Because we have concluded that the trial court did not abuse its discretion in determining that Sgt. Coleman had reasonable suspicion to stop Orsag's vehicle, we overrule Orsag's first issue.

### III

In his second issue, Orsag contends the evidence is legally insufficient to prove that he had previously been convicted two or more times of the offense of driving while intoxicated. Specifically, he contends the State failed to link three prior judgments to him through Woodling's testimony and the jury's comparison of Orsag's signature to court documents filed in this case.

### A

▆▆▆▆ In reviewing the legal sufficiency of the evidence to support a conviction, the critical inquiry is whether, considering the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim.App.2002). Although we consider all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim. App.2000). Further, the standard of review on appeal is the same for both direct- and circumstantial-evidence cases. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim.App.2004). The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony, and it is the exclusive province of the jury to reconcile conflicts in the evidence. *Mosley v. State*, 983 S.W.2d 249, 254 (Tex.Crim.App.1998).

▆▆▆▆ To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a conviction exists, and (2) the defendant is linked to the conviction. *Flowers v. State*, 220 S.W.3d 919, 921–22 (Tex.Crim.App.2007). No specific document or mode of proof is required to prove these two elements. *Id.* Although evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of different ways, including (1) the defendant's admission or stipulation, (2) testimony by a person who was present when the person was convicted of the specified crime and can identify the defendant as that person, or (3) documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted. *Id.* Any type of evidence, documentary or testimonial, might suffice. *Id.* at 922. Further, the State may use circumstantial evidence to prove the defendant is the same person named in the alleged prior convictions. *Gilmore v. State*, No. 14–06–00620–CR, 2007 WL 2089294, at *6 (Tex.App.-Houston [14th Dist.] July 24, 2007, pet. ref'd) (mem. op., not designated for publication) (citing *Human v. State*, 749 S.W.2d 832, 835–36, 839 (Tex.Crim.App.1988) (op. on reh'g)). The factfinder looks at the totality of the evidence to determine whether the State proved the prior conviction beyond a reasonable doubt. *Id.* (citing *Flowers*, 220 S.W.3d at 923).

### B

At trial, the State presented three certified judgments and sentences reflecting that a Christopher Orsag or Christopher Lee Orsag was convicted of the following offenses:

- State's Exhibit 4: Driving while intoxicated—second offense, on February 3, 2000, in Brazos County;

- State's Exhibit 5: Driving while intoxicated, on February 9, 1995, in Harris County; and

- State's Exhibit 6: Driving while intoxicated—Class B, on August 11, 2000, in Brazoria County.

Holli Woodling, Orsag's fiancé, testified that she had known Orsag about thirteen or fourteen years, and that she was familiar with his handwriting. She testified that she was with Orsag when he was stopped for DWI in Harris County in 1995, and testified that the signature on State's Exhibit 5 was Orsag's signature. She also testified that she "knew about" "his DWI in Brazos County" and testified that she believed the signature on State's Exhibit 4 was Orsag's.[2] She also testified the signature on State's Exhibit 6 was Orsag's. On cross-examination, Woodling testified that she had no personal knowledge of whether Orsag actually signed the documents, and agreed that "the best you can tell us [is] that that appears to resemble his signature" on each of the documents. She also testified she did not understand the difference between a conviction and a deferred adjudication, and she had no personal knowledge of whether any plea bargains occurred in any of Orsag's prior cases.

In addition, shortly before the end of the State's case, the State offered Exhibits 7, 8, and 9, certified copies of criminal-case-reset forms allegedly signed by Orsag in this case. Orsag's counsel objected to the forms as not relevant, but the State argued they were relevant for signature comparison by the jury. The trial court overruled the objection and admitted the exhibits.

### C

Orsag contends Woodling's testimony is insufficient to link Orsag to the prior convictions because on cross-examination she expressed uncertainty about her identifications of his signature, and, with respect to State's Exhibit 6, she testified only that it "looked like" Orsag's signature. Further, citing *Cain v. State*, 468 S.W.2d 856, 859 (Tex.Crim.App.1971), Orsag argues that the jury was not permitted to make a handwriting comparison. In *Cain*, the Court of Criminal Appeals stated:

> The question before us is whether the State sufficiently established the identity of the appellant as the person so previously convicted. We conclude that under the circumstances of this case,

---

2. Orsag contends State's Exhibit 4 was never identified by any witness and Woodling never testified with respect to the signature on it. The record shows that the State asked Woodling about Orsag's "DWI in Brazos County," and then began to ask Woodling to "identify the signature on State's Exhibit—," when Orsag's counsel interrupted and asked to take Woodling on voir dire. After the voir dire examination, the State asked Woodling whether the signature on the unidentified exhibit was Orsag's, to which she answered, "Yes." Thus, the State asked Woodling to identify the signature on the exhibit immediately after asking her about Orsag's "DWI in Brazos County," which is the same county as the judgment and sentence in Exhibit 4. Further, the State asked Woodling about State's Exhibit 5 before it began to ask about the unidentified exhibit, and asked about State's Exhibit 6 after concluding its questioning concerning the unidentified exhibit. Thus, when read in context, it becomes clear that the State was questioning Woodling concerning Orsag's signature on Exhibit 4. Additionally, at the end of this line of questioning, the State asked whether Orsag's signature was "on all these documents," to which Woodling answered, "Yes." Immediately after that, the State offered Exhibits 4, 5, and 6, and they were admitted over Orsag's counsel's objection. Therefore, we disagree with Orsag that no testimony was elicited concerning State's Exhibit 4.

where handwriting samples are introduced without expert testimony and the jury alone must make the comparison, and there is no other evidence to connect the appellant with the prior convictions, such identity has not been sufficiently established.

*Id.* at 859.

The State responds that the admission of the certified judgments and sentences of the prior convictions, Woodling's testimony concerning her knowledge of Orsag's prior convictions,[3] her comparison of the signatures on the judgments and sentences with Orsag's handwriting, and the admission of the certified copies of reset forms Orsag signed, which the jury could use to make its own handwriting comparison, were sufficient to prove Orsag's prior convictions. The State also notes that the Court of Criminal Appeals overruled *Cain* in *Littles v. State,* 726 S.W.2d 26, 32 (Tex.Crim.App. 1984) (op. on reh'g), to the extent that it held that that there were exclusive means of proving up a defendant's identity. Concerning the reset forms, the State points out that article 38.27 of the Texas Code of Criminal Procedure provides in relevant part that "[i]t is competent to give evidence of handwriting by comparison, made by experts or by the jury." *See* Tex.Code Crim. Proc. art. 38.27 (Vernon 2005). The State also points out that Orsag's signature was on State's Exhibit 1, the "DIC–24" form, and this exhibit was admitted without objection and was available to the jury for signature comparison. Taken together, the State argues, these forms of proof are sufficient under *Flowers* to enable the jury to find beyond a reasonable doubt that the convictions existed and that Orsag was the one convicted. *See Flowers,* 220 S.W.3d at 924.

Orsag contends that the State's evidence is insufficient to link him to the prior convictions because it does not rise to the level of proof held to be sufficient in *Flowers* and *Bautista v. State,* 642 S.W.2d 233 (Tex.App.-Houston [14th Dist.] 1982, pet. ref'd). In *Flowers,* the State offered into evidence a certified copy of the appellant's driver's license record and a computer printout from the Dallas County clerk showing a prior conviction for a DWI. *Id.* at 920–21. Both documents contained the same name, date of birth, address, personal descriptors, and information concerning the DWI conviction. *Id.* at 921. The driver's license record also had a picture of the person named on the document so that the fact finder could compare it to the person in the courtroom. *Id.* at 925. The court held that the documents, considered together, were sufficient to prove beyond a reasonable doubt the existence of the appellant's prior DWI conviction. *Id.* In *Bautista,* this court held the evidence was sufficient to establish that the appellant was the same person named in prior judgments when the State presented testimony from a parole officer who identified the appellant as the same person who reported to him under the prior judgments. 642 S.W.2d at 236–37.

---

**3.** We note that Woodling did not specifically testify she was aware of prior "convictions" as the State asserts, but she testified she was with Orsag in 1995 when he was stopped for DWI in Harris County (Exhibit 5), and she "knew about" Orsag's "DWI in Brazos County" (Exhibit 4). This, in conjunction with her confirmation that the prior judgments reflect Orsag's signature, is some evidence to support the prior convictions. *See Thomas v.* *State,* No. 2–08–125–CR, 2009 WL 2356891, at *6 (Tex.App.-Fort Worth July 30, 2009, no pet.) (per curiam) (mem. op., not designated for publication) (holding defendant's brother's testimony that he knew the defendant had served time in the penitentiary for "something happening at the MHMR home" and his identification of his brother's photograph in a pen packet was sufficient to prove up the defendant's prior conviction for sexual assault).

Here, we do not have records containing photographs of the previously convicted person or testimony from a parole officer concerning his knowledge of a defendant's prior convictions. Nevertheless, in *Littles v. State*, the Court of Criminal Appeals stated that even unorthodox methods of proof can be sufficient to prove a prior conviction. 726 S.W.2d 26, 32 (Tex.Crim. App.1984) (op. on reh'g) ("[W]here as in the instant case, the proof [of the defendant's prior conviction] though unorthodox, was clearly sufficient, no error will be found."). Further, the *Flowers* court likened evidence that may be used to prove a prior conviction to pieces of a jigsaw puzzle:

> [O]rdinarily the proof that is adduced to establish that the defendant on trial is one and the same person that is named in an alleged prior criminal conviction or convictions closely resembles a jigsaw puzzle. The pieces standing alone usually have little meaning. However, when the pieces are fitted together, they usually form the picture of the person who committed that alleged prior conviction or convictions.

220 S.W.3d at 923 (citing *Human*, 749 S.W.2d at 835–36). The court went on to explain that "[r]egardless of the type of evidentiary puzzle pieces the State offers to establish the existence of a prior conviction and its link to a specific defendant, the trier of fact determines if these pieces fit together sufficiently to complete the puzzle" based on the totality of the evidence admitted. *Id.*

The puzzle pieces before the jury in this case included the following: (1) Woodling's testimony that she was familiar with Orsag's handwriting and that in her opinion the signatures on the prior judgments and sentences from Brazos, Brazoria, and Harris Counties were Orsag's; (2) Woodling's testimony that she was with Orsag when he was arrested for DWI in Harris County and she knew about Orsag's "DWI" in Brazos County; and (3) documents purportedly signed by Orsag in this case, which the State offered for the purpose of enabling the jury to make its own handwriting comparison.

We disagree with Orsag that Woodling's testimony concerning his signatures was too uncertain to constitute probative evidence. The testimony Orsag refers to was Woodling's admission that she had no personal knowledge that Orsag actually signed the documents because she was not with him when he signed them, and she had no "other" personal knowledge of whether he actually signed the originals. But those admissions do not negate the probative value of Woodling's prior testimony. Woodling was Orsag's fiancé, she had known him for over thirteen years, and she testified that she was familiar with his handwriting and signature. Her testimony that the signatures "resemble" or "look like" Orsag's signature is competent opinion testimony the jury was entitled to consider. *See Denham v. State*, 574 S.W.2d 129, 131 (Tex.Crim.App.1978) (opinions of lay witnesses, when competent, are admissible concerning handwriting).

Additionally, the jury had before it State's Exhibit 1, which contained Orsag's signature and was admitted without objection, to use to compare to the signatures on State's Exhibits 4, 5, and 6.[4] Assuming *Cain*'s holding that a jury's comparison of handwriting samples is insufficient to establish identity absent some additional evi-

---

4. As discussed below, we assume for purposes of Orsag's fourth issue that the admission of State's Exhibits 7, 8, and 9 for the purpose of handwriting comparison by the jury was error.

dence linking the appellant to the prior conviction is still good law, the case is distinguishable. Here, the jury also had before it Woodling's testimony, and so there was more evidence connecting Orsag to the prior convictions than just a comparison of his signature. *Cf. Cain,* 468 S.W.2d at 859; *see also Meek v. State,* No. 03–05–00269–CR, 2006 WL 2080644, at *3 (Tex.App.-Austin July 28, 2006, no pet.) (mem. op., not designated for publication) (stating that, in addition to considering other evidence, the jury could compare signatures on fingerprint cards to defendant's signature to link prior offenses to defendant, explaining that "[t]he State need not present expert testimony regarding the handwriting comparison because the jury is capable of making such a comparison" and citing Texas Code of Criminal Procedure article 38.27).

Therefore, we hold that on these facts the means used were sufficient under the totality of the evidence admitted to show that Orsag was the person convicted in the prior cases. *See Flowers,* 220 S.W.3d at 922–23.

## IV

In his third issue, Orsag contends the trial court erred in overruling his objection to the State's alleged misstatement of the law in its opening statement. Specifically, he contends the prosecutor's statement during opening argument that "any loss of mental or physical faculties" constitutes intoxication was a misstatement of the law.

## A

During the State's opening statement, the following exchange occurred:

5. To the extent Orsag complains of trial court error during the closing argument, he did not obtain a ruling on his objection and therefore he has not preserved the issue for review. *See* Tex.R.App. P. 33.1; *see also Cockrell v. State,* 933 S.W.2d 73, 89 (Tex.Crim.App.1996)

[State]: And the law was any loss of mental or physical faculties. That was the strict standard. That was what we talked about yesterday, and that's what the State has to prove—any loss, not drunk.

[Defense]: Judge, I'm going to object to the extent he's misstating the law. The law as to intoxication is defined in the Penal Code. He's straying from that definition.

[State]: That's exactly the definition.

[The Court]: Overruled.

[State]: It's any loss....

Later, during closing argument, the issue arose again:

[State]: But the actual law, as you know from voir dire, is intoxicated, any loss, if he has any loss of the normal use of his faculties.

[Defense]: Misstating the law.

[State]: That's exactly the law.

[Defense]: That's not the law. Loss of the normal use.

[State]: It's the law.

[The Court]: Isn't that—I think that's what he said.

[State]: That's exactly, it's the law.

[The Court]: The jury's got the law in the charge.

Orsag contends the State misstated the law by defining the term "intoxicated" as "**any loss** of mental or physical faculties."[5] The relevant legal definition of "intoxicated" is "**not having** the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled sub-

("Before a defendant will be permitted to complain on appeal about an erroneous jury argument ... he will have to show he objected and pursued his objection to an adverse ruling.").

stance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." Tex. Penal Code Ann. § 49.01(2)(a) (Vernon 2003) (emphasis added). The jury charge tracked the statutory definition.

## B

Orsag contends the definition of "intoxicated" does not include the term "any loss," and therefore the trial court erred by overruling his objection to this misstatement of the law. Further, Orsag argues that the error affected his substantial rights because the jury was allowed to convict him based on an incorrect understanding of the law, and the trial court compounded the error by overruling Orsag's attempts to correct the misstatement of law.

■■■■ To fall within the realm of proper jury argument, the argument must encompass one of the following general areas: (1) summation of the evidence presented at trial; (2) a reasonable deduction drawn from the evidence; (3) an answer to the opposing counsel's argument; or (4) a plea for law enforcement. *Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex.Crim.App. 2000). It is not error for the State to quote or paraphrase the jury charge. *Whiting v. State,* 797 S.W.2d 45, 48 (Tex. Crim.App.1990). But it is error for the State to present a statement of the law that is contrary to that presented in the charge to the jury. *Id.*

■■■■ We will assume for purposes of argument that the State misstated the law

as appellant contends. Because any error is nonconstitutional, however, we will disregard it if it does not affect Orsag's substantial rights. *See* Tex.R.App. P. 44.2(b); *Arnold v. State,* 234 S.W.3d 664, 674 (Tex. App.-Houston [14th Dist.] 2007, no pet.). A substantial right is affected when the improper jury argument has a substantial and injurious effect or influence on the jury's verdict. *Arnold,* 234 S.W.3d at 674. To determine whether an improper jury argument is harmful, we consider (1) the severity of the misconduct or prejudicial effect, (2) any curative measures taken, and (3) the certainty of conviction or punishment assessed absent the misconduct. *Id.* Absent evidence to the contrary, the jury is presumed to follow the instructions set forth in the court's charge. *Hutch v. State,* 922 S.W.2d 166, 172 (Tex.Crim.App. 1996).

## C

■■■■ Here, although the State paraphrased "loss of normal use" as "any loss" of mental or physical faculties, the degree of prejudicial effect, if any, was minimal. Further, the jury was correctly charged on the legal definition of intoxication. The charge was read aloud to the jury, and the trial court later specifically referred to the definition of intoxication in the charge in response to Orsag's objections to the State's argument. Orsag contends the jury could have found that he was not intoxicated as defined in the charge because the evidence of intoxication hinged on Sgt. Coleman's testimony alone,[6] and so

---

6. Sgt. Coleman testified that his patrol car was an older model that did not automatically begin recording when the overhead lights are activated, and he admitted he erred in failing to turn on the video camera to record his encounter with Orsag. Consequently, the jury did not have video to accompany Coleman's testimony concerning Orsag's behavior during the field-sobriety tests. Orsag also

points to Coleman's testimony that it was possible his opinion that Orsag was intoxicated was incorrect, and his testimony that Orsag operated his vehicle in a safe manner, he did not stumble or grab onto his vehicle for support when he got out of it, and he appeared to have no problem balancing. But Coleman also testified that his opinion was that Orsag was intoxicated because both his

the State's modified definition "could have easily affected the jury's verdict." But there was substantial evidence that Orsag was intoxicated. Orsag's fiancé testified that Orsag drank that night, he smelled of alcohol, he pulled over to the wrong side of the road, he exhibited signs of intoxication on all of the field-sobriety tests, and he refused a breath test. Therefore, the evidence is sufficient for the jury to find Orsag was intoxicated, whether it considered either the State's interpretation of the definition or the definition contained in the charge.

Finally, Orsag argues that, by allowing the State to misstate the law, "the only reasonable conclusion the jury could draw was that the prosecutor was stating proper law." *See Kincaid v. State*, 534 S.W.2d 340, 342 (Tex.Crim.App.1976) (holding that trial court's failure to sustain objection to prosecutor's misstatement of parole law to appellant's detriment was harmful error and noting that jury assessed maximum penalty allowed). But the trial court instructed the jury to follow the charge immediately after the last exchange between the State and the defense concerning the definition of intoxication, and Orsag fails to direct us to any evidence that the jury disregarded the court's charge. The mere assertion that the jury "could" have been influenced does not rise to the level of evidence rebutting the presumption that the jury followed the charge.

Therefore, we conclude that the State's misstatement of the law to the jury, if any, did not have a substantial and injurious effect or influence in finding Orsag guilty. *See* Tex.R.App. P. 44.2(b); *Herrera v. State*, 11 S.W.3d 412, 415–16 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (holding trial court's error in overruling objec-

tion to prosecutor's misstatement of law of intoxication that differed from definition in charge was harmless when there was evidence supporting the jury's verdict and it was presumed the jury followed the instructions in the charge). We overrule Orsag's third issue.

## V

In his fourth issue, Orsag contends the trial court erred in overruling his objection to the admissibility of State's Exhibits 7, 8, and 9, which were certified copies of reset forms he allegedly signed. Orsag contends the State laid no foundation for the admission of the documents, presented no testimony relating to the documents, and offered no evidence connecting any of the signatures in those exhibits to him. At trial, Orsag objected to the admission of the documents on relevancy grounds, but the State argued that the documents were relevant for signature comparison by the jury. The trial court overruled Orsag's objection.

## A

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401. We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App.2007). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.*

The erroneous admission of evidence is nonconstitutional error. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.

---

mental and physical faculties were impaired, he was unsteady on his feet, his eyes were bloodshot, the odor of alcohol was on his

breath, he failed the field-sobriety tests, and he refused to perform the field-sobriety tests at the jail or take the breath test.

1998). Any nonconstitutional error that does not affect substantial rights must be disregarded. Tex.R.App. P. 44.2(b). In determining whether a substantial right is affected, we consider everything in the record, including evidence of the defendant's guilt. *See Motilla v. State,* 78 S.W.3d 352, 357–58 (Tex.Crim.App.2002).

### B

Assuming the admission of State's Exhibits 7, 8, and 9 was error, any error was harmless because other evidence supported the jury's finding that Orsag signed the admitted judgments and sentences. As noted above, Orsag's fiancé testified that she believed the signatures on State's Exhibits 4, 5, and 6 were Orsag's, and she also testified about her own knowledge of Orsag's prior arrests for DWI. The jury also had before it State's Exhibit 1, the "DIC–24" form that Orsag signed after his arrest, confirming that he refused to take a breath test. This exhibit was admitted into evidence without objection and was available for the jury to use for signature comparison. *See* Tex.Code Crim. Proc. art. 38.27. Further, Orsag never claimed State's Exhibits 7, 8, and 9 did not contain his signature, nor did he did he object on this basis. Therefore, any error in the admission of these forms for signature comparison was harmless. *See* Tex.R.App. P. 44.2(b).

\*      \*      \*

We overrule Orsag's issues and affirm the trial court's judgment.