

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00609-CR

---

MATTHEW LEE BARNETT                        APPELLANT

V.

THE STATE OF TEXAS                             STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
### TRIAL COURT NO. CR12446

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Matthew Lee Barnett appeals his convictions for possession of less than one gram of methamphetamine and delivery of between four and 200 grams of methamphetamine. In one point, Barnett argues that the trial court abused its discretion by denying his motion to suppress evidence discovered after police stopped him, arrested him, and searched his vehicle and person. We will affirm.

## II. BACKGROUND

The State's charges against Barnett stem from a series of events in which undercover police officers conducted a narcotics purchase from two of Barnett's associates. The fruits of the resulting arrests in that transaction led police to Barnett. After stopping Barnett's vehicle in Granbury, Texas, police arrested him. Following the State's indictment, Barnett filed a motion to suppress evidence stemming from that stop. At the suppression hearing, the State stipulated that they did not stop and search Barnett and his vehicle pursuant to a warrant.

Ray Miller, a narcotics investigator with the Hood County Sheriff's Office, testified that on September 7, 2012, he texted with and then arranged to meet William Youngstrom and Travis Duval in Cresson, Texas, to conduct an undercover narcotics purchase. The deal was for Miller, playing his role as an undercover officer, to meet Youngstrom and Duval at a convenience store, get into Duval's vehicle, and purchase a quarter ounce of methamphetamine for $550. As Miller got into Duval's vehicle, he overheard Duval say to someone on his cellphone, "He just got in." Miller bought methamphetamine from Youngstrom and Duval and then immediately arrested them. Because Youngstrom and Duval were found in possession of 8.5 grams of methamphetamine during the arrest and because they sold the methamphetamine to Miller, both were arrested for delivery of a controlled substance weighing between four and 200 grams, a first-degree felony. *See* Tex. Health & Safety Code § 481.112 (West 2010). During these arrests, Miller confiscated both Youngstrom's and Duval's cellphones.

2

Soon after, Duval's phone rang and the name "Matt" appeared on the screen. Miller did not answer the call.

Shortly thereafter, however, Youngstrom's phone rang with the same name appearing on the screen. Miller answered this call. According to Miller, the person on the other end of the phone claimed ownership of the methamphetamine and expressed to Miller that Miller owed him money for the drugs. Miller said that during this phone conversation, he left "Matt" with the impression that he had "robbed his couriers."

Miller then transferred "Matt"['s] number to his own phone and began texting with him. Through a series of texts between "Matt" and Miller, the contents of which the State introduced at the suppression hearing, "Matt" indicated again that Duval and Youngstrom were his couriers, that he assumed Miller had robbed them, and that he was willing to do business with Miller "if [they] could get past this particular setback and [Matt] could get his money."

Miller arranged to meet "Matt" in Granbury, a city approximately thirteen miles from Cresson. Approximately five hours after Youngstrom's and Duval's arrests, "Matt" texted that he was ready to meet with Miller. Through texts, "Matt" instructed Miller that he was in a Classic Inn motel in Granbury "five minutes away from Walmart"; that he was on his way to meet Miller at a local restaurant to collect the money regarding the transaction with Youngstrom and Duval; and that he would be driving a "blue Suzuki SUV." Miller said that he and fellow officers were very familiar with this area of Granbury.

3

During this time, Miller said he was in constant contact with other Hood County Sheriff's officers, relaying them all of this information. Miller said that he had instructed other officers to stop "Matt" before the arranged meetup because, through texts, Miller had come to believe that "Matt" might be in possession of guns and because Miller was concerned that if the meetup occurred, officer safety would be an issue.

Richard Odom, a patrol sergeant for the Hood County Sheriff's Office, also testified at the suppression hearing. He said that he worked with Miller during the events of September 8, 2012. According to Odom, Miller had advised him of the meetup with "Matt." Odom specifically testified that Miller had relayed to him that "Matt" would be in a blue Suzuki SUV near a specific hotel in Granbury and that this vehicle was related to the earlier drug buy involving Youngstrom and Duval. Odom said that he relayed this information to fellow officers, who were also working in conjunction with Miller, and that he witnessed one of the officers, pursuant to Miller's instructions, stop a vehicle matching the description Miller had given in the area where Miller said it would be. Odom said that he was trailing Hood County Sheriff's Deputy Josh Lane as Lane initiated the stop of the blue Suzuki SUV.

Lane also testified at the suppression hearing. Lane said that he began tailing Barnett's vehicle on the night of September 8, 2012, because it matched the description of a vehicle that he had been informed needed to be stopped. Specifically, Lane said that he had "[r]eceived information that a subject was

4

coming into Granbury by the name of Matt, [who] was supposed to be driving a blue Suzuki, [and] supposed to be coming into town in regards to a . . . narcotics arrest made earlier in the day in Cresson." Lane said that he initially followed the "blue Suzuki SUV" because it was near "a hotel . . . about five minutes from the local Walmart," a location he had learned from other officers would be where "Matt" would be found. Like the other officers who testified, Lane said that he was very familiar with that area of Granbury. Lane averred that he followed Barnett for a short time to see if he would commit a traffic violation.

According to Lane, as Barnett neared "the location where [he] was supposed to go to meet" Miller, he initiated a traffic stop, ostensibly because Barnett had failed to maintain driving in a single lane. After stopping Barnett, Lane "ran the license plate" and discovered that Barnett's first name was "Matthew." From there, Lane asked Barnett if he would consent to a vehicle search. By Lane's account, Barnett initially replied that he did not want Lane to "tear up his car," but after Lane reassured him that he would not tear up the vehicle, Barnett consented to a search.

While searching Barnett's vehicle, another deputy discovered an unlocked safe in the trunk of the vehicle. Upon opening the safe, Lane said he "detected the strong odor of marijuana" emanating from the safe. He also found "plastic spoons, needles, [and] cut-off straws with a crystal-like substance inside them." He then placed Barnett under arrest. Further searching of the vehicle revealed

5

marijuana seeds and a cigarette pack found in the passenger area containing 0.23 grams of methamphetamine.

At the close of the suppression hearing, the trial court denied Barnett's motion to suppress. In its findings of fact and conclusions of law, the trial court specifically found that at the time of the stop, Lane had received enough information from other officers to have formed a reasonable suspicion that Barnett was a party to the transaction that occurred earlier that day in Cresson, and that therefore Lane had reasonable suspicion that Barnett was engaged in criminal activity. The trial court also specifically found that Barnett had "freely and voluntarily consented to the officers' search of his vehicle."

A jury returned a verdict of guilty on both of the State's charges— possession of a controlled substance less than one gram and, as a party to the offense, delivery of a controlled substance between four and 200 grams. The jury assessed punishment at two years' confinement for the possession charge and forty years' confinement for the delivery charge. The trial court entered judgment accordingly, ordering the sentences to run concurrently, and this appeal followed.

## III. DISCUSSION

In his sole point, Barnett states that he is contesting "the validity of the traffic stop and its duration." Among the arguments contained in his sole point regarding his contention that the trial court erred by not suppressing the evidence, Barnett argues that he did not commit a traffic offense in Lane's

6

presence; that the duration of Lane's detention, based on an alleged traffic violation, surpassed the necessary time to obtain his consent to search his vehicle; and that Lane did not have probable cause to arrest him for his involvement in the arrests earlier in the day in Cresson. Barnett goes on to argue that because the evidence he sought to suppress "was the basis of the charges for which [he] was convicted," his convictions should be reversed. We disagree.

We first note that Barnett did not argue at the trial court specifically what evidence the trial court should have suppressed. *See Miller v. State*, 312 S.W.3d 162, 166 (Tex. App.—Fort Worth 2010, no pet.) ("Nowhere, though, has Appellant identified the specific items of evidence or categories of evidence he sought to exclude by challenging the three search warrants."); *see also Brennan v. State*, 140 S.W.3d 779, 781 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding global request to suppress "all evidence seized or obtained" from alleged illegal searches and failure "to identify what, if any, evidence was ruled upon by the denial" presented nothing for appellate review). In his suppression motion filed in the trial court, Barnett requested that "[a]ll evidence, both physical evidence as well as statements by [Barnett], collected as a result of the traffic stop in this case should be suppressed." On appeal, Barnett has requested that this court reverse the trial court's order denying his motion to suppress and hold that the trial court should have suppressed "any items found in the SUV or on [his] person after the traffic stop, including but not limited to: phones, straws, baggies and scales." Thus, there is authority to suggest that Barnett has not

7

preserved his point for our review.  *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005), *cert. denied*, 549 U.S. 861 (2006) ("Appellant's global statements in his pretrial motion to suppress were not sufficiently specific to preserve the arguments he now makes on appeal.").

But even considering Barnett's argument that all the evidence gathered from his vehicle, "as well as statements [made]" after Lane detained him, should have been suppressed, Barnett's sole point on appeal must be overruled because he fails to challenge a ground stated by the trial court in its findings of fact and conclusions of law as to why Lane's stopping of Barnett was in fact constitutionally firm—that Lane had reasonable suspicion that Barnett was a party to the methamphetamine sale that occurred in Cresson prior to Lane having stopped him.

## A.    Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.  *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

8

It is a longstanding rule that an appellate court must uphold the trial court's order on a motion to suppress "on any theory of law applicable to the case." *See State v. Esparza*, 413 S.W.3d 81, 85 (Tex. Crim. App. 2013) (*citing Calloway v. State*, 743 S.W.2d 645, 651–52 (Tex. Crim. App. 1988)); *see also Alford v. State*, 400 S.W.3d 924, 929 (Tex. Crim. App. 2013) (holding that conclusions of law are reviewed de novo so that trial court's order is upheld under any legal theory supported by the facts).

## B. Lane's Reasonable Suspicion

Even though Lane testified that one of the reasons he initiated a traffic stop of Barnett's vehicle was because Barnett had failed to maintain a single lane of traffic, the trial court did not make such a finding. Instead, the trial court specifically found that Lane had reasonable suspicion to stop Barnett based on the information he had received from fellow officers regarding Barnett's involvement in the arrests of Youngstrom and Duval. This finding is supported by the law and the facts as determined at the suppression hearing.

Under the Fourth Amendment, a warrantless detention of a person that amounts to less than a full-blown custodial arrest must be justified by reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 150 (2011). A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Id.*

9

This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. *Id.* It also looks to the totality of the circumstances—those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified. *Id.* The relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular noncriminal acts. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists. *Derichsweiler*, 348 S.W.3d at 914.

Here, despite Barnett's contention that the only reason Lane gave at the suppression hearing for stopping him was a perceived traffic violation, Lane testified that other cooperating officers had relayed to him specific, articulable facts that, when combined with rational inferences, would have led him to believe that Barnett was involved in the transaction that led to the arrests of Youngstrom and Duval earlier that day. Lane testified that he had received information that a "Matt" was coming into Granbury "in regards to a transaction or narcotics arrest made earlier in the day in Cresson." Lane also testified that he stopped Barnett's "blue Suzuki SUV" because it was near "a hotel . . . about five minutes from the

local Walmart," a location he had learned from other officers would be where Barnett's vehicle would be found. And like the other officers who testified, Lane said that he was very familiar with that area of Granbury. In its findings of fact, the trial court found this testimony to be credible.

We hold that the trial court did not abuse its discretion by finding that Lane had reasonable suspicion to stop Barnett's vehicle. *See Orsag v. State*, 312 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2010, pet ref'd) (holding that officer had reasonable suspicion to stop defendant's vehicle for speeding after receiving information from fellow officer describing the make, model, and location of defendant's vehicle); *see also Francis v. State*, No. 08-03-00316-CR, 2005 WL 1208142, at *2 (Tex. App.—El Paso May 19, 2005, no pet.) (not designated for publication) ("The undercover officer had first-hand knowledge of the offense and relayed that knowledge to his fellow officers.").

## C.    Barnett Consented to Lane's Search of His Vehicle

In another portion of Barnett's sole point, he contends that the duration of Lane's stop exceeded the necessary duration applicable to a traffic violation. Again we note that the trial court did not make an explicit finding of fact or conclusion of law that Lane stopped Barnett for a traffic violation. We do, however, conclude that the trial court's finding of fact that Barnett consented to an unlimited search of his vehicle is supported by the facts adduced at the suppression hearing.

11

We also find support in the record for the trial court's conclusion of law that Barnett "freely and voluntarily consented to the officers' search of his vehicle" and that such consent was "positive and unequivocal." This conclusion is based on Lane's testimony that Barnett expressly consented to the search, which the trial court found to be true. *See James v. State*, 102 S.W.3d 162, 173 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[R]easonable suspicion is not required for a police officer to request consent to search an automobile after the reason for an initial stop is concluded as long as a message is not conveyed that compliance is required.").

## IV. CONCLUSION

We hold that the trial court did not abuse its discretion by denying Barnett's motion to suppress. Thus, we overrule Barnett's sole point and affirm the trial court's judgments.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

Dauphinot, J., filed a dissenting opinion.

PUBLISH

DELIVERED: June 18, 2015

12