COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-138-CR

NOLBERTO GURRUSQUEITA, JR. APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

A jury convicted Appellant Nolberto Gurrusqueita, Jr. of murder and assessed his punishment at forty years’ confinement in the Institutional Division of the Texas Department of Criminal Justice.  The trial court sentenced him accordingly.  In two points, Appellant argues that the trial court erred by denying his motion to suppress and by admitting as punishment evidence testimony regarding his juvenile criminal record.  Because we hold that the trial court did not err, we affirm the trial court’s judgment.

Factual Background

On November 24, 2003, Benito Soto was shot and killed at the Timber Ridge Apartments in Arlington, Texas.  Soto was a user and dealer of “ice,” a crystal form of methamphetamine.  According to his fiancee’s testimony at trial, Soto had left their apartment that evening to meet with Juan Gurrusqueita, Appellant’s cousin, to buy drugs.  She testified that Soto left the apartment around 6:30 p.m. carrying “thousands of dollars” and a 9mm automatic and wearing a bulletproof vest.  He and Juan were seen a short time later at a gas station located about a five-minute drive from the apartment.

Oliverio Garcia, a resident of the Timber Ridge apartment complex, testified at trial.  According to his testimony, around dusk, he saw a man with something tucked under his arm walking across the parking lot.  Garcia saw a white SUV, close to the man, with an open door on the driver’s side.  He saw Appellant, standing by the SUV, fire several shots at the man.  Garcia dropped to the ground and hid under his truck.  From there, he could see only Appellant’s feet and legs.  He heard several more shots and saw Appellant return to the SUV and drive away.

Police responded to 911 calls and found Soto’s body at the foot of a stairway in the breezeway of the apartment building.  Investigators found several shell casings near the body.  They did not find Soto’s pistol or the “thousands of dollars” in cash.

Soto’s sister gave the police some notes in Soto’s handwriting, one of which contained driving directions to Rogers Street.  The directions do not contain the address “106” but instead have a number that could be “40” or “406,” but they also say “last left,” and the last house on the left is 106 East Rogers.  That address is one that the police already had for Appellant.  Officers began surveillance of a house at 106 East Rogers Street and saw a white Suburban there two or three different times.  Officers checked the vehicle’s registration and discovered that although it was not registered to Appellant, he had been issued several citations while driving it.  Officers obtained an arrest warrant for Appellant and arrested him while he was driving the Suburban.  After the arrest, the police gave the media Appellant’s mug shot.  The news outlets reported Appellant’s arrest and showed the mug shot.  Garcia saw part of the news clip on the arrest, although he testified that he did not see the photo on the news.

The police spoke with Garcia and obtained a statement from him about what he witnessed that night.  They showed Garcia a photographic lineup that included Appellant’s mug shot, the same mug shot that had been shown in the news.  Garcia identified Appellant in the line up.

While in jail, Appellant told his cell mate that he had “messed up by shooting somebody.”  The cell mate testified that Appellant had said that he had shot a man wearing a bulletproof vest because the man had owed his cousin money and that the man was supposed to buy drugs from him at a gas station.

Motion to Suppress

In his first point, Appellant argues that the trial court erred by denying his motion to suppress because under the “totality of the circumstances” test, the “four corners” of the arrest warrant affidavit did not provide sufficient probable cause to justify the issuance of a warrant.  An arrest warrant affidavit must provide the magistrate with sufficient information to support an independent judgment that probable cause exists to believe that the accused has committed a crime.
(footnote: 1)  In assessing the sufficiency of an affidavit for an arrest warrant, the reviewing court is limited to the four corners of the affidavit.
(footnote: 2)  The reviewing court should interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences.
(footnote: 3)
 The affidavit in this case, drafted and signed by Detective Danny Nutt of the Arlington Police Department, is an excellent example of a proper affidavit to support an arrest.  The affidavit provides in relevant part,

MY BELIEF AS AFORESAID IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:

On or about 11-24-03, at 1405 Elite Circle (Timber Ridge Apartments) in Arlington, Tarrant County, Texas, [Appellant] intentionally caused the death of Benito Soto by shooting Benito in the head with a firearm, while in the course of committing the offense of Robbery of Benito Soto.

Said offense was reported by Cruz Rosas to the Arlington Police Department as Offense No. 030082507 on 11-24-03.

Among the Property taken/involved during this offense was:

Stolen unknown brand 9mm handgun, holster, magazines, and ammunition.

Stolen unknown brand night vision monocular device.

Stolen $13,000.00 (approximately) in U.S. currency.

Stolen black front or fanny pack.

Stolen black and tan back pack.

Stolen gold rope necklace with religious medallion.

[Affiant] has read offense report 030082507 and learned the following facts and circumstances concerning this case.

On Monday, 11-24-03, at approximately 1924 hours, Arlington Police Officer D. Fulbright #2091 was dispatched to 1405 Elite Circle, near apartment #216 of the Timber Ridge Apartments, in response to a report of a shooting.

On arrival Officer Fulbright discovered the body of a Hispanic male, later identified as Benito Soto . . . lying on his back at the bottom of a short flight of stairs in the courtyard directly East of building #1405.  Benito Soto was found to be deceased and had apparent multiple gunshot wounds to his head.  Several witnesses reporting hearing gunshots, however there were no eye witnesses to the actual shooting found.  A white Chevrolet Suburban was observed leaving the location at a high rate of speed at the time of the shooting.  Neighbors saw the white Suburban leave the scene immediately after the shooting.  The Neighbors were interviewed and their names are left out of the affidavits for their protection.  The scene was secured and Crime Scene and Crimes Against Persons Detectives were requested.

[Affiant] was contacted at 1939 hours and arrived on scene at 2039 hours. [Affiant], with the assistance of Detective Frias, met with Crime Scene Officer Isbell and Tarrant County Medical Examiners Investigator Clary.  Several spent 9mm shell casings and projectiles were recovered from the scene and entered into evidence. . . . An autopsy was performed on Benito Soto by Tarrant County Medical Examiner Dr. Sisler on 11-25-03.  Benito Soto was found to have multiple gunshot wounds to his head.  The manner of Benito Soto’s death has been ruled a homicide and the cause as multiple gunshot wounds.

On 11-26-03 [Affiant] received a Tarrant County Crime Stoppers tip reference this homicide.  The anonymous informant advised the death of Benito Soto involved an illegal drug transaction and that the suspect shooter was a Hispanic male known as “Berto Gaona,” who lives on E. Rogers Street in Arlington.  The informant advised Benito Soto tried to run up the stairs, but was physically restrained by Berto’s unknown Cousin.  The informant stated Benito Soto begged for his life, but that Berto shot Benito Soto in the head multiple times.  The informant gave the names of Berto’s Mother, Father, and girlfriend, as well as other identifying information.  Using this information [Affiant] has identified “Berto Gaona” as [Appellant] through Arlington Police Department computer records. [Appellant] shows to live at 106 E. Rogers Street in Arlington and has been handled by the Arlington Police Department on several occasions, including investigations for drugs—delivery of controlled substance and an arrest for unlawfully carrying a weapon (firearm), and murder.  The house at 106 E. Rogers Street is known to the Arlington Police Department for drug and gang activity.  [Appellant] was issued citations by the Arlington Police Department in August and October of 2003 driving a white 1994 Chevrolet Suburban with Texas license plate 8DRN03.  This same White Chevrolet Suburban has been observed by [Affiant] and Detective Ford on several occasions parked in the driveway of 106 E. Rogers Street since the death of Benito Soto.  None of the information reference the multiple gunshots to the head of Benito Soto or the drug dealing scenario was ever released to the media during this investigation.  [Affiant] learned that [Appellant] served 5 years in [TYC] for a 1994 homicide in Grand Prairie, Texas when [Appellant] was 15 years old.  The victim in the Grand Prairie homicide was shot repeatedly in the head with a 9mm handgun in a fashion similar to the shooting of Benito Soto.

[Affiant] and Detective Ford have met with an informant who knew Benito Soto.  This informant fears retaliation if it is learned that this informant is giving information about the case.  [Affiant] and Detective Ford have met with this informant on several occasions and the informant has been fully identified.  For the protection of the informant and informant’s family, the identity of the informant will not be revealed for purposes of this affidavit as the public will have access to the affidavit.  This informant has cooperated fully and has agreed to testify in the future . . . .  This informant provided [Affiant] with a written statement detailing these events.

The informant advised Benito Soto was a drug dealer in East Dallas and Grand Prairie, primarily dealing in “ice,” a form of methamphetamine.  The informant advised that several days prior to his death, Benito Soto had run out of his supply of ice and was looking for a connection to purchase more.  The informant stated Benito Soto was attempting to do a large drug transaction with a subject known to the informant as “Tow Truck Juan.”  The informant advised Tow Truck Juan attempted to meet with Benito Soto several days prior to Benito Soto’s death to arrange to have Benito Soto meet with unknown subjects to purchase the drugs.  The informant advised Tow Truck Juan gave Benito Soto directions to a location in Arlington, near Collins Street and Rogers Street, where he was to meet with Tow Truck Juan and the other drug supplier.  The informant advised this meeting did not take place, however the informant advised Benito Soto wrote down the directions to the meeting location in Arlington.

These handwritten directions were found at the victim’s residence and are in the possession of [Affiant].  Using these written directions, [Affiant] and Detective Ford followed them to 106 E. Rogers Street in Arlington.  The informant advised further that on the night Benito Soto died, he had been picked up by Tow Truck Juan and that Tow Truck Juan was taking Benito Soto to meet with drug dealers in Arlington to purchase a large quantity of illegal methamphetamine.  The informant stated that when Benito Soto left with Tow Truck Juan that Benito Soto was carrying a large amount of U.S. currency to purchase the drugs and was carrying a[n] unknown brand 9mm handgun in a holster around his waist, possibly a Beretta.  The informant added that Benito Soto was also carrying a back and tan colored back pack that held a small monocular night vision device, a black front or fanny pack, and that Benito Soto was wearing a gold necklace with a religious medallion.  Information obtained by [Affiant] and Detective Ford from a friend and a family member of the victim has indicated Benito Soto was carrying approximately $13,000.00 in U.S. currency at the time of his death, . . . which he was going to use to purchase drugs.  At the time Benito Soto was found dead, he was not found in possession of the 9mm pistol and holster, the fanny pack, the back pack with the night vision device, or the gold necklace with the medallion, or the $13,000.00.  Benito Soto was found to have only $295.00 in his wallet, not the large amount he was reported to have left with.

[Affiant] and Detective Ford were contacted by another anonymous informant who confirmed that Juan Gurrusqueita was in fact attempting to introduce Benito Soto to Juan Gurrusqueita’s Cousin so Benito Soto could purchase illegal drugs from Juan Gurrusqueita’s Cousin.  This informant also fears retaliation and for the purposes of this Affidavit will not be identified.  This informant has been fully identified and has agreed to cooperate.

Tow Truck Juan has been identified by [Affiant] and Detective Ford as Juan Gurrusqueita . . . .  [He] had originally been identified by [Affiant] and Detective Ford as the subject who picked up Benito Soto and gave him a ride just prior to his death.  Juan Gurrusqueita advised he had dropped Benito Soto off on Pioneer Parkway and had not known where Soto went from there.  Juan Gurrusqueita admitted to [Affiant] that he was attempting to “hook up” or introduce Benito Soto to his Cousin, [Appellant], so that [Appellant] could sell Benito Soto a quantity of ice.  Juan Gurrusqueita has identified a Texas drivers license photograph of [Appellant] as being his Cousin he was trying to introduce to Benito Soto for the purpose of an illegal drug transaction.

Within the four corners of the affidavit, Officer Nutt set out the information he received and the lengths to which he went to corroborate that information.  All information received from untried informants is corroborated, and the corroboration appears in the affidavit.  The affidavit sets out in detail the bases for the officer’s claim of probable cause to believe the crime was committed by Appellant and more than adequately sets out probable cause to support the issuance of the warrant.  Because the underlying affidavit sufficiently sets out probable cause to arrest Appellant for the murder of Benito Soto, we overrule Appellant’s first point.

Evidence of Juvenile Record

In his second point, Appellant argues that the trial court reversibly erred by admitting at the punishment stage of the trial “testimony regarding [his] juvenile criminal history.”  Appellant’s complaint concerns evidence offered by the State about an extraneous murder that he committed as a juvenile.  But Appellant’s mother and the mother of Appellant’s girlfriend, both defense witnesses at punishment, testified without objection that Appellant had committed the prior murder.  Appellant’s mother testified without objection that Appellant had shot a thirteen-year-old girl and had been confined in the Texas Youth Commission from age fourteen to age twenty-one.  Appellant’s girlfriend’s mother testified that she had known Appellant for five years and that she was aware that Appellant had committed a murder in his past because her daughter had told her about it.

It is well settled that a trial court does not reversibly err by admitting evidence over objection where the same evidence is admitted elsewhere during trial without objection.
(footnote: 4)  We therefore overrule Appellant’s second point.

Conclusion

Having overruled Appellant’s two points, we affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

PUBLISH

DELIVERED:  November 15, 2007

FOOTNOTES
1:
McFarland v. State
, 928 S.W.2d 482, 509 (Tex. Crim. App. 1996).

2:
Hankins v. State
, 132 S.W.3d 380, 388 (Tex. Crim. App.), 
cert. denied
, 519 U.S. 1119 (2004), 
overruled on other grounds
, 
Mosley v. State
, 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998), 
cert. denied
, 526 U.S. 1070 (1999); 
Jones v. State
, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), 
cert. denied
, 507 U.S. 921 (1993).

3:
Hankins
, 132 S.W.3d at 388; 
Jones
, 833 S.W.2d at 124.

4:
Lane v. State
, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004); 
Leday v. State
, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).