

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00399-CR

KEVIN RAY BECKSTRAND                                    APPELLANT

V.

THE STATE OF TEXAS                                          STATE

----------

FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1309368D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant, Kevin Ray Beckstrand, of the offense of stalking and assessed his punishment at ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $5,000 fine. In five issues, Appellant argues that (1) the trial court erred by denying his motion to recuse the trial judge; (2) the evidence was insufficient to prove he

---

[1]*See* Tex. R. App. P. 47.4.

committed the offense of stalking; (3) the trial court erred by admitting hearsay statements; (4) the trial court, during the punishment phase of trial, erred by admitting a letter Appellant had sent to the trial judge; and (5) Appellant's punishment violates the Eight Amendment's ban on cruel and unusual punishment. We affirm.

## Background

In the indictment, which we break down for easier comprehension, the State alleged that on or about December 23, 2012, in Tarrant County, Texas,

- Appellant knowingly engaged in conduct that was directed specifically at another, namely, Erin Beckstrand (Complainant);

- Appellant knew or reasonably believed that Complainant would regard the conduct as threatening bodily injury or death to herself;

- said conduct caused Complainant to be placed in fear of bodily injury or death;

- said conduct would cause a reasonable person to fear bodily injury or death for herself;

- the conduct occurred on more than one occasion and was pursuant to the same scheme or course of conduct, to-wit:

- on or about July 25, 2011, Appellant purchased a firearm;

- on or about July 26, 2011, Appellant took that firearm to Complainant's residence;

- on or about July 26, 2011, Appellant entered Complainant's residence;

- on or about July 26, 2011, Appellant, while at Complainant's residence or habitation, threatened to harm her;

2

- on or about October 6, 2011, Appellant went to the Children's Courtyard in violation of a court order; and

- on or about September 20, 2012, through December 29, 2012, Appellant wrote and sent letters to Complainant.

The State alleged the offense of stalking. *See* Act of May 19, 2011, 82nd Leg., R.S., ch. 591, § 1, 2011 Tex. Sess. Law Serv. 1433 (West) (effective September 1, 2011),[2] *amended by* Act of May 24, 2013, 83rd Leg., R.S., ch. 1278, § 2, 2013 Tex. Sess. Law Serv. 3232 (West) (effective September 1, 2013) (current version

---

[2]The statutory language itself provides:

(a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

(1) the actor knows or reasonably believes the other person will regard as threatening:

(A) bodily injury or death for the other person;

. . . .

(2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or fear that an offense will be committed against the other person's property; and

(3) would cause a reasonable person to fear:

(A) bodily injury or death for himself or herself. . . .

*Id.* The State's "on or about" date of December 23, 2012, suggests the State was relying on the statute in effect on September 1, 2011. To the extent some of Appellant's conduct predated the changes that became effective September 1, 2011, none of those changes impacted Appellant's case.

3

at Tex. Penal Code Ann. § 42.072(a)(1)(A), (2), (3)(A) (West Supp. 2014). Stalking is a third degree felony punishable by imprisonment in the Texas Department of Criminal Justice for any term of not more than ten years and by a fine not to exceed $10,000. *Id.* § 12.34 (West 2011), § 42.072(b).

After hearing the evidence, the jury convicted Appellant as charged in the indictment. After hearing additional evidence, the jury assessed Appellant's punishment at ten years' imprisonment and a $5,000 fine. The trial court sentenced Appellant in accordance with the jury's recommendation.

**Sufficiency of the Evidence**

In his second issue, Appellant attacks the sufficiency of the evidence. Appellant seeks an acquittal. We address this issue first because it potentially disposes of the entire proceeding against Appellant definitively.

*Standard of Review*

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

4

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. The law as authorized by the indictment means the statutory elements of the charged offense as

5

modified by the factual details and legal theories contained in the charging instrument.  *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor.  *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution."  *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

*The Evidence*

A pawnbroker testified that on July 25, 2011, he sold an Ultra Star nine-millimeter pistol to Appellant.  The form the pawnbroker submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives, which was admitted into evidence as State's Exhibit 1, provided information corroborating the purchaser was Appellant.

6

Complainant's brother remembered July 26, 2011, because he received multiple phone calls from Complainant, who was extremely panicked, just before 10:00 p.m. He said Complainant told him that someone had broken into her house, and she asked him to come over quickly; he went straight over to her house where he saw a vehicle, a Ford F-150, parked in the driveway that he did not recognize and, moments later, Appellant coming out of the garage from inside the house. Complainant's brother said he was somewhat shocked because Appellant no longer lived there. According to Complainant's brother, Appellant screamed and yelled at him and then began hitting him.

Complainant testified that on the night of July 26, 2011, she was upstairs taking a shower when she heard a banging, so she turned the shower off; she heard more banging and noises from someone wandering downstairs and called her brother. She then heard the garage door open and more yelling. "There was cursing and, [']I'm going to kill you,['] and something about Jesus, something about the kids, something about my family, just more banging." Complainant said she called her brother a second time, and he said he was coming right over. Complainant then called the police, who instructed her to hide, so she hid in the closet in the bathroom. She heard more yelling and fighting, and she recognized one of the voices as Appellant's. Complainant remained hidden in the closet until the police arrived.

Upon seeing her brother, Complainant was scared because he was bruised, swollen, and cut. There was broken glass, and her back door was

7

broken. Complainant and Appellant's engagement picture had been rehung on the wall, and a cross had been scratched into the wall. Appellant was in the neighbor's yard across the street.

Officer Joshua Russell, who responded to Complainant's call for help, testified that Appellant had told other officers at the scene that the F-150 truck parked in Complainant's driveway was his. Officer Russell described the "lady at the house," whom he later learned was Complainant, as "very hysterical." Appellant also informed the officers at the scene that there was a loaded weapon in the vehicle. When searching the vehicle, Officer Russell found a loaded Ultra Star nine-millimeter pistol and pepper spray in a holster. In a letter to the Justice Department that was admitted into evidence, Appellant acknowledged that both the truck and the weapon were his.

After Appellant was charged with burglary of a habitation, he was placed on a bond on August 26, 2011. As a condition of his bond, he was ordered not to contact Complainant or any of her family members. He was also prohibited from going within 1,000 feet of any "exclusion zones," which were areas in which Complainant and her family members lived, worked, or, in the case of her children, went to school. Court officials repeatedly informed Appellant about the bond requirements in detail. One exclusion zone was a location described as the Children's Courtyard, where Complainant's children went to school.

On October 6, 2011, senior court officer Mark Tittle received a notice of a violation of that exclusion zone. Only two days earlier, Appellant had called Lisa

8

Hunt, the probation officer assigned to monitor Appellant's bond, and had announced that he was going to violate an exclusion zone. When Hunt informed Appellant that an arrest warrant would issue for him if he violated an exclusion zone, Appellant responded, "Good, I'll have my mom ready with the shotgun." When Tittle confronted Appellant about the shotgun remark, Appellant admitted making it. Tittle described Appellant as irrational and angry. Tittle said Appellant admitted already having violated exclusion zones.

The director of the Children's Courtyard testified that she was working on October 6, 2011. She said Appellant came into the building, asked if his children were there and if they were okay, and then left. The director said she was aware Appellant was ordered not to be in the building, so she immediately called Complainant.

Appellant was convicted of the offense of burglary of a habitation with intent to commit an assault in September 2012. All but one of the letters in State's Exhibit 6 were written after Appellant's conviction in September 2012 until the end of December 2012. Complainant said she did not count the number of letters, but she described them as "pages and pages and pages and pages." She added, "I was getting them like every day, sometimes two, three letters a day." Complainant said Appellant was mad at her because she had testified against him at the trial.

On an envelope of a September 25, 2012 letter, Appellant wrote, "I have washed my hands of you and this tragedy." However, Appellant signed an

9

October 29, 2012 letter, "Forever your loving husband and eternal companion." Complainant said that concerned her because Appellant did not recognize they were divorced. Complainant said the letter made her very afraid "[b]ecause he [thought] he has some sort of claim on me, some sort of right to me . . . ."

In a December 7, 2012 letter, notwithstanding the fact they were divorced, Appellant addressed it to "[m]y lovely wife"; in it, Appellant wrote that Complainant had betrayed her family and marriage. In the last paragraph, Appellant wrote that he needed Complainant's love; Complainant said this concerned her because she thought he would come straight to her once he got out of prison. Complainant thought Appellant was supposed to be paroled on January 4, 2013. Complainant was also anxious because Appellant was angry at her and did not think he had done anything wrong.

Regarding Appellant's violations of the exclusion zones in October 2011, Complainant said she received a phone call about Appellant's violating the exclusion zones, and she feared Appellant was going after her family. Because she was out of town at the time and unable to help, this added to her apprehension.

In an October 27, 2012 letter, Appellant wrote, "[Complainant], I will protect you if you work with me." Appellant signed the letter, "See ya January 4th, 2013. Love you!" Complainant was worried because Appellant was getting out and coming to see her, and she did not know who was going to protect her. In an October 27, 2012 letter addressed to her two children, Appellant wrote, "Good

news.  I will return to your world not later than January 4, 2013."  Complainant was frightened that Appellant was going to take her children.  In the letter, Appellant told the children that he was working undercover for the government and that was the reason he was in jail.

In an October 29, 2012 letter, Appellant wrote, "[Y]ou made me a convicted felon on 9/19/12.  Great day in my life!"  Complainant said Appellant was blaming her for his conviction and was not accepting any responsibility for what he had done to her brother when he broke into her home, which made her uneasy.

On October 28, 2012, Appellant wrote Complainant's son.  In the letter, Appellant said, "I don't know exactly when I will see you.  I'm still in a little danger.  There is a judge, prosecutor and sheriff that is going to be very mad at me soon.  It should be no later than January 4, 2013.  See you soon."

In a November 4, 2012 letter to Complainant, Appellant wrote, "I have given you ample opportunity to do the right thing and have compassion on your children, and you have refused!"  He also wrote, "I deserve to have a loving companion and family, and I will have it."

Complainant said the manner in which Appellant jumped back and forth in his letters scared her.  Complainant said she was afraid Appellant would hurt her bodily or kill her if he was released.  She testified that was what Appellant's letters were telling her.  Complainant said the lack of a direct threat to kill her was what made the letters scary; "Because they're just all veiled threats, and he just keeps going back and forth from hating me, to loving me, to eternity, to not even

11

recognizing the divorce. It's just scary." She said she was afraid Appellant was never going to let her go.

In a December 3, 2012 letter, Appellant wrote, "I'm deeply troubled and saddened by how bitter, coldhearted and evil you have become." Appellant then told Complainant that he had instructed his attorney to file a motion in family court and gave Complainant until December 9, 2012, to respond to him in person, which, contextually, meant visiting him in jail.

In another letter, dated December 6, 2012, addressed to Appellant's brothers but sent to Complainant, Appellant wrote, "I am done trying to get through to her and trying to protect her. There needs to be accountability for this. . . ." Complainant said Appellant's wanting to hold her accountable was a very common theme.

In another letter, Appellant wrote Complainant, "If there are [in]discretions physically that you have concealed in our marriage and separation, acknowledge them to me and get over it. We are still united under the law of Israel." He continued, "I can pronounce you clean as my wife and invite you to come unto me with open arms and in unconditional love." He added, "You are my queen of Israel, and I am your warrior king." Appellant ended the letter, "Your husband and friend, Kevin Roy Beckstrand." Appellant, in the first part of the letter, referred to himself "[a]s your former husband." Complainant described his letter as crazy.

In a December 9, 2012 letter to Complainant, Appellant started by telling Complainant that he loved her and wrote, "And I'm so proud of you and your strength and endurance through this separation." In the next paragraph, Appellant wrote, "I need you to be submissive." Complainant said she was concerned because Appellant wanted control of her and did not recognize the divorce. Appellant instructed Complainant to thank her brother for taking a beating on behalf of the family. Complainant explained that because Appellant wanted to thank her brother for taking a beating at Appellant's hands, she was placed in fear of bodily injury because Appellant thought her brother deserved to get beaten. She said that in this manner, Appellant was showing he was violent, and he made her fear for herself. Appellant ended the letter, "Love always, your king and baby daddy, Roy."

In another letter dated December 9, 2012, addressed to Complainant's son but sent to Complainant's address, Complainant said Appellant considered her son to be Appellant's unborn twin, and he thought they would, therefore, be connected forever. Complainant said she was afraid for her son and for herself. She wondered what Appellant would do to her to get to her son.

On December 11, 2012, Appellant sent Complainant hair and a wire scorpion. Complainant said the scorpion was a threat. "I mean, what is a scorpion other than a death threat?"

Outside the presence of the jury, the trial judge warned Appellant that the bailiff had informed him that Appellant was still trying to communicate with

Complainant while she was on the witness stand and instructed him to stop it. The judge said, "You need to control yourself. The jury is watching you."

*Discussion*

In his brief, Appellant argues there were many inferences that were not inculpatory that could have been drawn from the evidence. We must, however, presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170. When viewing the evidence in the light most favorable to the verdict, the evidence shows that Appellant engaged in a scheme or course of conduct on more than one occasion, as set out in the indictment, directed specifically at Complainant, his former wife and the person whom he blamed for his burglary conviction, to intimidate her into submitting to some sort of reconciliation through violence, through threats of violence, and through a total disregard of any boundaries—Complainant's or, for that matter, the trial court's—which (1) Appellant knew or reasonably believed Complainant would regard as threatening bodily injury or death, (2) which caused Complainant to be placed in fear of bodily injury or death, and (3) which would have caused a reasonable person to fear bodily injury or death. We hold that the necessary inferences were reasonable based upon the cumulative force of the evidence. *See Sorrells*, 343 S.W.3d at 155; *see also Temple*, 390 S.W.3d at 360. From these facts, we hold that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

14

Having found the evidence sufficient, we overrule Appellant's second issue.

## Failure to Recuse

In Appellant's first issue, he contends the presiding judge for the Eighth Administrative Judicial Region, Judge Jeff Walker, erred by denying his motion to recuse Judge Ruben Gonzalez Jr., the presiding judge of the 432nd District Court, because Judge Gonzalez was biased against Appellant.

Appellant filed a motion to recuse Judge Gonzalez on the grounds that (1) Judge Gonzalez had a personal bias or prejudice concerning Appellant, (2) Judge Gonzalez had personal knowledge of Appellant's prior mental health issues which would prejudice his rulings, and (3) Judge Gonzalez's previous dealings with Appellant had resulted in his having a bias against Appellant. Appellant's written motion did not articulate the factual bases for any of his allegations. [3]

---

[3]Specifically, in Appellant's motion to recuse, he alleged:

II.

The impartiality of the Honorable Ruben Gonzale[z] might reasonably be questioned. Defendant currently has a case pending before the 2nd Court of Appeals in which he was convicted in this court. Defendant questions the Judge's ability to separate issues previously litigated from those currently on trial.

III.

The Honorable Ruben Gonzale[z] has a personal bias or prejudice concerning a party to this case. The Judge has personal

Judge Gonzalez declined to recuse himself and referred Appellant's motion to the administrative judge of the judicial region, Judge Walker, as required under rule 18a of the rules of civil procedure. *See* Tex. R. Civ. P. 18a(f)(1)(B). Judge Walker presided over the hearing on Appellant's motion to recuse on May 24, 2013, as provided by the statute rule. *See* Tex. R. Civ. P. 18a(g)(1).

Before addressing the merits of Appellant's contention, we first determine the scope of the record we will consider in conjunction with Appellant's complaints.

*State's Motion to Strike Exhibits Attached to Appellant's Brief*

In conjunction with Appellant's recusal argument, he attached to his brief selected pages from the reporter's record of his earlier burglary trial (Exhibit A) and selected portions of his brief on the merits in his earlier burglary appeal

---

knowledge of Defendant's prior mental health issues which would prejudice rulings resulting in Defendant not receiving a fair trial. In addition, the Judge's previous dealings with Defendant has resulted in the Court having a bias against Defendant.

Appellant was relying on subsections (b)(1), (2), and (3) of rule 18b of the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 18b(b)(1) ("the judge's impartiality might reasonably be questioned"), (b)(2) ("the judge has a personal bias or prejudice concerning the subject matter or a party"), (b)(3) ("the judge has personal knowledge of disputed evidentiary facts concerning the proceeding"); *see also Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Crim. App. 1993) (holding procedure for recusal in criminal cases is controlled by rule 18a of the Texas Rules of Civil Procedure); *see also* Tex. R. Civ. P. 18a(a)(2) (incorporating the grounds listed in rule 18b).

(Exhibit B). Appellant asks this court to take judicial notice of the trial record and appellate brief in the earlier burglary case. Appellant correctly notes that an appellate court can take judicial notice of its own records in the same or related proceedings involving the same or nearly the same parties. *See Turner v. State*, 733 S.W.2d 218, 223 (Tex. Crim. App. 1987).

However, the State filed a motion to strike Appellant's Exhibits A and B. It argues that even though a trial court may take judicial notice of its own records, it cannot consider testimony from a previous trial unless the proponent of that testimony admits it into evidence at the subsequent proceeding. *See Davis v. State*, 293 S.W.3d 794, 797 (Tex. App.—Waco 2009, no pet.). In this case, Judge Walker told Appellant that he knew nothing about the earlier burglary case, and Judge Walker agreed to take judicial notice only of the fact that Appellant had been convicted in a previous case at which Judge Gonzalez presided. Judge Walker did not take judicial notice of the testimony from the prior trial or of any appellate brief Appellant had filed in conjunction with his prior conviction, and neither the record of the prior trial nor Appellant's appellate brief were admitted into evidence during the recusal hearing.

Appellate courts generally review a trial court's ruling in light of the arguments, information, and evidence that was available to the trial court at the time it ruled. *See Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (stating standard in context of admission or exclusion of evidence); *Orsag v. State*, 312 S.W.3d 105, 109 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd)

17

(stating standard in context of ruling on a motion to suppress). Because Exhibits A and B were not before Judge Walker when he ruled, we grant the State's motion to strike them from Appellant's brief. For the same reasons, we decline to take judicial notice of our own records of the prior appeal. To the extent Appellant, in his brief, relies upon Exhibits A and B, we cannot consider Appellant's assertions because they are not supported or found in the record that was before Judge Walker. *See Turner*, 733 S.W.2d at 223.

*Appellant's Motion to Recuse*

Appellant testified at the hearing. He believed that Judge Gonzalez was biased against him because the judge had ordered him to undergo two competency evaluations and because the judge had not granted Appellant's pro se motion for an appeal bond after his conviction in the first case. Appellant also believed that he had not received a fair trial because he "was entitled to certain affirmative defenses that [Judge Gonzalez] actually denied" during his first trial. Appellant did not provide any details about that ruling or any other rulings Judge Gonzalez had made during the burglary trial. As noted earlier, Judge Walker did not have before him the record from the earlier trial or Appellant's appellate brief attacking that conviction.

On cross-examination, the State established that Appellant's own counsel had requested at least one of the competency examinations, that Appellant had actually written Judge Gonzalez thanking him for how he had conducted the trial, that Judge Gonzalez had written Appellant in response to his pro se motion for

18

an appeal bond to inform him that he was not entitled to hybrid representation, and that Appellant did not know whether his appointed counsel had ever requested an appeal bond.

Judge Walker denied Appellant's motion to recuse. Explaining his decision from the bench, he said:

> [Y]ou can bring the rulings of the judge into question if you go further and show that bias or prejudice was the basis of the judge's ruling. You can't go the other way around. You can't go, ["]The judge ruled this way or that way, and that is evidence of the judge's bias.["] Doesn't work.

Judge Walker commented further:

> We've got [Appellant] feeling that the Judge is biased because he ruled against him and may even have made errors in the law. I'm not saying he did or didn't. That's not what I'm here for. That's what the Court of Appeals is here for. But a judge making errors in good faith—that is, errors that are not based on bias or prejudice—cannot be recused for making a good-faith bad judgment call.

*Standard of Review*

Rule 18a of the Texas Rules of Civil Procedure provides that the denial of a motion to recuse after a hearing is reviewed for an abuse of discretion on appeal from the final judgment. *See* Tex. R. Civ. P. 18a(j)(1)(A); *see also Gaal v. State*, 332 S.W.3d 448, 456 (Tex. Crim. App. 2011) ("An appellate court should not reverse a recusal judge whose ruling on the motion was within the zone of reasonable disagreement."). A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to the guiding rules or principles, or when it misapplies the law to the established facts of the case. *Kniatt v. State*,

239 S.W.3d 910, 912 (Tex. App.—Waco 2007, no pet.) (op. on reh'g). The reviewing court considers the totality of the evidence and information elicited at the recusal hearing to see if the record reveals sufficient evidence to support the recusal judge's ruling that the trial judge was not biased. *See Gaal*, 332 S.W.3d at 456.

*Discussion*

Judge Gonzalez's involvement in prior competency proceedings is not a basis for recusal. *See Kniatt*, 239 S.W.3d at 918 (quoting *Liteky v. United States*, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157 (1994)). When the alleged bias is not from an extrajudicial source, the only proper basis for recusal based on bias is a bias indicating a high degree of favoritism or antagonism. *Roman v. State*, 145 S.W.3d 316, 322 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Appellant has made no showing how Judge Gonzalez's participation in and knowledge of the competency proceedings in the prior case translated into a deep-seated favoritism or antagonism that would make fair judgment impossible in this case. *See Kniatt*, 239 S.W.3d at 918.

Regarding Judge Gonzalez's denial of certain defensive issues in Appellant's previous trial, adverse rulings are not, standing alone, a basis for recusal; rather, adverse rulings are remedied by assigning error, not by filing motions to recuse. *See Cumpian v. State*, 812 S.W.2d 88, 91 (Tex. App.—San Antonio 1991, no pet.); *see also* Tex. R. Civ. P. 18a(a)(3). Appellant assigned error in his earlier case based on legal error and was vindicated. *Beckstrand v.*

20

*State*, No. 02-12-00480-CR, 2015 WL 1544077, at *10 (Tex. App.—Fort Worth Apr. 2, 2015, no pet.) (mem. op., not designated for publication).

Regarding Appellant's complaint that Judge Gonzalez denied an appeal bond in the prior case, Judge Gonzalez did not refuse to set an appeal bond; rather, he refused to consider a pro se motion while Appellant was represented by counsel. Appellant was not entitled to hybrid representation. *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007). Although Appellant testified that trial counsel had already informed him that she no longer represented him after his sentencing, the record does not show that he made any efforts to correct Judge Gonzalez of his misunderstanding. The record is not clear on what efforts, if any, Appellant made to have his appellate counsel pursue an appeal bond. It is also not clear what effect, if any, the stalking indictment and the $25,000 appearance bond set on it had on appellate counsel's handling of the appeal bond on the previous conviction.

Appellant argues that a comment by Judge Gonzalez during the previous trial provides actual evidence of "'aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.'" *See Gaal*, 332 S.W.3d at 453 (quoting *Liteky*, 510 U.S. at 558, 114 S. Ct. at 1158 (Kennedy, J., concurring)). Judge Gonzalez's remark, however, was neither introduced into evidence nor referred to by any party during the recusal hearing. Additionally, although Appellant in his brief sets forth Judge Gonzalez's comment, he does not provide any information regarding what prompted the

21

comment; consequently, whether the statement reflects extreme animosity or a judge's forceful effort to prevent Appellant from further disrupting the courtroom is not possible. "'[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women' may display, do not establish bias or partiality." *Id.* at 454 (quoting *Liteky*, 510 U.S. at 555–56, 114 S. Ct. at 1157). Consequently, a trial judge's ordinary efforts to maintain courtroom order and decorum do not render the judge subject to recusal. *Id.* at 454. More importantly, at the hearing, Appellant failed to show that a "fair-minded person" could not set aside whatever animosity or hostility the comment might have reflected.

Appellant also points to various rulings Judge Gonzalez purportedly made erroneously during the stalking trial as further evidence that Judge Gonzalez could not set aside the alleged hostility he had developed toward Appellant during the earlier trial. Judge Walker conducted the hearing on the motion to recuse before the stalking trial. Consequently, those events were not before Judge Walker when he ruled. *See Dragoo*, 96 S.W.3d at 313; *Orsag*, 312 S.W.3d at 109. Judge Walker could not have abused his discretion by failing to consider events that had not yet even occurred.

Based upon Appellant's motion and upon the evidence presented at the recusal hearing, we hold Judge Walker did not abuse his discretion by denying Appellant's motion to recuse. *See* Tex. R. Civ. P. 18a(j)(1)(A). The ruling was neither arbitrary nor unreasonable, is supported in the guiding rules or principles,

22

and correctly applied the law to the established facts of the case.  *See Kniatt*, 239 S.W.3d at 912.

Finding no abuse of discretion, we overrule Appellant's first issue.

**Mark Tittle's Testimony**

In his third issue, Appellant argues that the trial court reversibly erred by allowing Mark Tittle to testify as to statements Appellant made to Lisa Hunt. Appellant contends the statements were inadmissible hearsay, were not admissible under the "state-of-mind" exception to the hearsay rule, and were not otherwise admissible under the rule of optional completeness, which was the basis on which the trial court ultimately admitted Hunt's statements to Tittle.  *See* Tex. R. Evid. 107, 801(d), 803(3).  Specifically, Tittle testified that Hunt told him that Appellant was going to violate the exclusion zone and that after Hunt had explained to him what would happen if he violated the exclusion zone, Appellant said his mother would be ready with a shotgun.  Tittle explained that Appellant had to wear a GPS ankle monitor so the probation department could see where he was.  Tittle further explained that the probation department then set out zones around certain areas of town that were "lined out by GPS," so that if Appellant entered into one of these zones, Appellant's ankle monitor would notify the probation department that Appellant was in a prohibited area.  Tittle said, "An exclusion zone is essentially just an area where [Appellant was] forbidden to go."

For the reasons set out below, we hold that error was not preserved.  The following testimony by Tittle came in without objection:

23

Q. (BY [PROSECUTOR:]) What information were you provided on October the 4th that led you to have concern that more than one person was in danger besides law enforcement?

A. [Tittle:] The Defendant called his probation officer, Lisa Hunt, and spoke with her. He told her that he was in his doctor's office, and he was saying that he was going to violate the exclusion zone.

Q. Let me stop you. Does that cause you concern?

A. Yes.

Q. Why?

A. Well, the exclusion zones set by the Court are intended to protect the safety of the injured party, her family, ensure their safety. And him saying that he's going to violate one of those exclusion zones indicates he is disregarding the conditions set by the Court to protect their safety.

Q. The information wasn't, I miss my kids, I want to go see my child; it was I'm going to go violate the exclusion zone?

A. Yes.

Q. The exclusion loan—the exclusion zone violation, was it just at the location where the kids were?

A. No.

Q. It's numerous?

A. Yes.

Q. Matter of fact, on October 4th, you're given information about his statement about a shotgun?

A. That's when I got the information about the shotgun, yes.

Q. The first time?

A. Yes.

24

Q. What exactly were you told?

A. When Lisa Hunt told him that a warrant would be issued if he violated his exclusion zone, [Appellant] stated, ["]I don't have to answer the door. Will they knock down the door and pull me out kicking and screaming?["]

His officer advised, ["]They may because if you violate the exclusion zone, there will be a warrant.["]

The Defendant said, ["]Good, I'll have my mom ready with the shotgun,["] and he left.

Additionally, Tittle testified without objection that he had been involved in conversations with Appellant himself during which Appellant made similar statements:

Q. [By the prosecutor:[4]] And why were you monitoring his behavior that day?

A. [Tittle:] I had a phone call with [Appellant] earlier in that day in—in which it was discussed that he had a shotgun and that he and his family intended to protect themselves if police came to arrest him.

Q. Basically a threat to law enforcement?

A. Yes.

Q. And you took that seriously?

A. Given the demeanor that he had when I spoke with him on the 3rd and the—the tone that he—he conveyed to me during my conversation with him on the 6th, I was afraid that he could potentially hurt anyone that disagreed with him.

---

[4]The reporter's record identifies the questioner as defense counsel. However, Tittle, who was called by the State, was on redirect examination, and contextually it is clear that the questioner was the prosecutor.

25

Q.  So when you were monitoring his travels that day, it wasn't simply he's going to go see his kids, but could he go see somebody else?

A.  I was concerned he was going to hurt someone, period.

Q.  And he confirmed for you the statement about having a shotgun and willing to use it?

A.  Yes.[5]

Tittle also testified that Appellant had acknowledged to Tittle himself that Appellant had violated his exclusion zones:

I told him that he needed to come in.  We talked about his exclusion zones.  He had—he told me he had already violated them, he had several things he was going to do that day, and then he would come in and see me after he had done what all he wanted to do.

To properly preserve error, a party must object each time allegedly inadmissible evidence is offered.  Tex. R. App. P. 33.1(a); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).  Additionally, it is well settled that a trial court does not reversibly err by admitting evidence over an objection where the same evidence is admitted elsewhere during trial without objection. *Gurrussqueita v. State*, 244 S.W.3d 450, 455 (Tex. App.—Fort Worth 2007, pet. ref'd).  For all the above reasons, we hold Appellant did not preserve error.

Having ruled Appellant's third issue was not preserved, we overrule it.

---

[5]During the trial on punishment, apparently in an attempt to attenuate the severity of his statements to Hunt and Tittle, Appellant explained that the shotgun he was referring to was actually nothing more than a Super Soaker filled with lemon juice and cayenne pepper.

26

**Admission of Appellant's Letter to the Trial Judge**

In his fourth issue, Appellant contends the trial court erred by admitting during the punishment phase of trial a letter Appellant wrote to the trial judge. Appellant argues that most of the letter was irrelevant and, therefore, inadmissible; that to the extent it had any probative value, its probative value was substantially outweighed by the danger of unfair prejudice to Appellant and by the risks of confusion of the issues and misleading the jury; and that the trial court's error had a substantial and injurious influence in determining the jury's decision on punishment. See Tex. R. Evid. 402, 403; Tex. R. App. P. 44.2(b). The letter about which Appellant complains provides as follows:[6]

> To: hon. Judge Ruben Gonzalez                    January 14, 2013
>
> From: Kevin Roy Beckstrand CEO
> KROYBECK WEALTH EDU. PARTNERSHIP
> And your favorite recent defendant!
>
> Hello Sir,
>
> I has been awhile since I wrote you a personal letter. Your treatment of [my attorney] at trial really made me angry. Even though she was ill prepared and her personal hygiene the 1st day of trial was atrocious, she did not deserve your and [the prosecutor's] condescension! I did however. I realize that you did exactly what I asked you to do in the personal letters I wrote you in Sept. and Oct. of 2011.
>
> My beloved was protected from her FOOLISHNESS and STUPIDITY. Thank you for allowing me to be a man and the ability

---

[6]We have removed the names of the persons Appellant identifies in his letter and one anti-Semitic slur. We have not otherwise attempted to correct Appellant's spelling, grammar, or punctuation.

to display to her TRUE unconditional love.  SHE DOES NOT DESERVE!

When I signed the 2nd Bond paperwork, I put that I was employed, but enlisting in GOV'T SERVICE in honor of my FATHER [name deleted].  It has been a true honor working and learning from you how our GREAT JUDICIAL SYSTEM works.  T.C. is in need of a huge WHITEWASH.  One of my favorite songs, a part of my life training with [name deleted] a Criminal Atty in Dallas is "GET OVER IT" by the Eagles.  A line is "LET'S KILL ALL LAWYERS KILL THEM TONIGHT"  Not a bad thought.  Can we start with [the prosecutor]?  Lol!  I know he has a job to do, but he is a real prick!  He'd be better suited as a Def. Atty.  Thank him for me.  I've got my eye on him real close.  Appreciation to him is in order.

I'm done polishing your balls.  For the business at hand.  [Another defendant I know] is a good man and has employment with me upon his completion of SAFEP.  I will hold him accountable and ensure he is no longer an IDIOT DRUG ADDICT!  He is in your Court.

I have been summoned to family Court 360th on Jan. 17, 2013.  I DON'T HAVE THE FUNDS FOR ANOTHER BOND.  The papers I was served with from the 360th request my bond be lifted.  I have written my response already and mailed it to the Atty. [Complainant] retained for us, [name deleted] in Colleyville, TX.

I need to be released so I can get a hold of my H.S. Sweetie [name deleted].  We spoke while you had me committed to NTSH.  She said she loved me.  Her and I had lunch a couple times after the separation and planned to get back together once the divorce was final.  I signed my Divorce under Duress.  I do not want to go to family court and give in to [Complainant] under duress.  I need [my H.S. Sweetie] by my side.  Her name is [name deleted] of Dallas.  She has worked at Champs Rest. In Addison TX for about 12 yrs.  If you remember the Wonder Years on TV in the 90's.  She is my WINNEE COOPER!  I need to see her.  She's scared of [Complainant]!

Will you release me on Tues. or Wed. and appoint Cpl. [name deleted] to be my deputy guard and protector?  Will you also allow me to have my STAR 9 mm back?  I think I displayed how to properly handle a firearm in my case.  I DID NOT BRING IT INTO

28

THE HOME and I informed, for the safety of everyone, when FWPD arrived I had a pistol in my truck.

I am looking forward to a good friendship and association with your Court, to restore the Disgrace my family brought to it.

Also, I want to testify against my nephew [name deleted]. He raped a 12 yr old girl. He is in the POD across from 59C where I am. He had the nerve to call his aunt a [anti-Semitic slur] to my face. He must be affiliated with the ARYANS. What a retarded IDIOT! He also told Ofc. [name deleted] I was a piece of shit and I deserved to get my ass beat! He must of SNITCHED I'M a FED. ASSET and now official agent. I was assaulted and beat down 12/7/13. Cpl. [name deleted] is my witness to the GANG HIT by the AB's. [Name deleted] warned me! Once he went to bed, I was a Target.

Sorry I missed you on Friday 1/11/13.

Regards,

Kevin – ROY my friends call me.

In a criminal case, after a defendant has been found guilty, "evidence may be offered by the state . . . as to any matter the court deems relevant to sentencing." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2014). "Determining what is relevant then should be a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999).

During the punishment phase of trial, Appellant testified and asked for probation. On cross-examination, the State introduced the letter over Appellant's objection. Appellant acknowledged he wrote the letter after having been convicted of burglary of a habitation and after having been indicted for stalking.

29

The trial court, when admitting the letter, said it was relevant and should be considered by the jury for the purpose of rendering a fair and just punishment.

In its brief, the State argues that the letter's tone and cavalier attitude toward the court would help the jury when determining punishment. We agree. The letter is relevant because it illustrates Appellant's mindset without any filters; Appellant expressed himself with a frankness that one would not expect on the witness stand and which the jury deserved to hear when assessing his punishment. *See* Tex. R. Evid. 401. As the letter came straight from Appellant's pen, there was prejudice but no unfair prejudice. *See* Tex. R. Evid. 403; *see also McCallum v. State*, 311 S.W.3d 9, 15 (Tex. App.—San Antonio 2010, no pet.) (noting difference between prejudicial and unfairly prejudicial evidence; stating unfairly prejudicial evidence has an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one). Appellant's letter went to the heart of whether the jurors could trust Appellant if they placed him on community supervision or, once released from prison, whether Appellant would conduct himself appropriately.

Finding no error, we overrule Appellant's fourth issue.

### Whether Appellant's Punishment Violates the Eighth Amendment's Ban on Cruel and Unusual Punishment.

In his fifth issue, Appellant argues that his sentence was disproportionate to the offense he committed and violates the Eighth Amendment's prohibition against the infliction of cruel and unusual punishments. U.S. Const. amend. VIII.

Appellant notes that the maximum punishment he could have received was ten years' imprisonment and a $10,000 fine. *See* Tex. Penal Code Ann. § 12.34. The jury assessed his punishment at ten years' imprisonment and a fine of $5,000. Appellant did not object to his punishment and sentence when they were announced at trial. Appellant did not file a motion for new trial in which he raised this complaint. Appellant failed to preserve error. *See Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd). We overrule Appellant's fifth issue for lack of preservation.

## Conclusion

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 10, 2015